UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 93-1692

TICKETMASTER-NEW YORK, INC.,

Plaintiff, Appellant,

v.

JOSEPH M. ALIOTO,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Torruella, Selya and Stahl, Circuit Judges.

Jonathan W. Lubell, with whom Malcolm I. Lewin, Frank

McClain-Sewer, Morrison Cohen Singer & Weinstein, Stephen R.

Wainwright, and Wainwright, Wainwright, Wainwright, Wainwright &

Wainwright were on brief, for appellant.

James A. G. Hamilton, with whom Theodore F. Schwartz, Jerry

Cohen, and Perkins, Smith & Cohen were on brief, for appellee.

April 13, 1994

SELYA, Circuit Judge. This case probes the frontiers
SELYA, Circuit Judge.

of the doctrine of personal jurisdiction in a context fraught

with constitutional implications. The issue, simply put, is

this: Can a Massachusetts-based court, consistent with the Due

Process Clause, assert jurisdiction over a California resident

who is alleged to have made a defamatory comment during an

unsolicited telephone interview with a staff reporter for a

Massachusetts newspaper? We conclude, on the facts of this case,

that the lower court correctly disclaimed jurisdiction.

I. BACKGROUND

Inasmuch as the district court dismissed this suit for

failure of the plaintiff to make a prima facie jurisdictional

showing, see Boit v. Gar-Tec Prods., Inc., 967 F.2d 671, 675 (1st

Cir. 1992), we draw the facts from the pleadings and the parties'

supplementary filings, including affidavits, taking facts

affirmatively alleged by plaintiff as true and construing

disputed facts in the light most hospitable to plaintiff. Of

course, we do not credit conclusory allegations or draw

farfetched inferences. See generally Dartmouth Review v.

Dartmouth Coll., 889 F.2d 13, 16 (1st Cir. 1989) (discussing line

between "facts" and "conclusions" for purposes of a motion to

dismiss).

Defendant-appellee Joseph M. Alioto is an attorney

practicing in California. Among his other cases, Alioto is

pressing a class action in the California courts against

Ticketmaster-Southern California, Inc. (T-SC). T-SC, a

2

California-based corporation, is affiliated with Ticketmaster-New

York, Inc. (T-NY), a Delaware corporation. Both Ticketmaster

entities are engaged in the business of selling ducats to

entertainment events.

The litigation between T-NY and Alioto finds its

genesis in the decision by the Boston Globe, a daily newspaper,

to undertake an investigation into pricing practices on

"Ticketmaster's" part.1 In conducting this investigation, a

Globe reporter conversed by telephone with Alioto. The plaintiff

does not allege, and the record does not suggest, that Alioto

dialed the telephone or otherwise initiated the call. The record

is equally barren of any showing that Alioto solicited the

inquiry2 or that more than one call occurred. It is clear,

nevertheless, that Alioto, who was in California, knew when

speaking that his comments would inform a story slated for

publication in a newspaper circulated chiefly in Massachusetts.

The investigation culminated in a front-page expose

that hit the newsstands on Sunday, September 20, 1992, under the

banner headline, "Rising ticket fees pad concert profits." The

ensuing article contained over fifty paragraphs. Well past the

midpoint, the article mentioned mounting complaints about price

1The article that capped this investigation makes no attempt
to distinguish among corporate entities (although it contains one
vague reference to "Ticketmaster and its affiliates"). At no
point does the article refer by name to either T-NY or T-SC.

2Although there is a passing allusion in the record to a
press release issued by Alioto regarding the lawsuit against T-
SC, there is no indication that he forwarded this release to
Massachusetts or that it sparked the Globe's story.

3

gouging in New York and California. It then reported that "three

class action antitrust lawsuits" had recently been filed "against

Ticketmaster" in California. There followed the paragraph around

which this controversy revolves (buried deep in the body of the

article). We quote the allegedly offending paragraph in full,

and, in the interests of context, add the beginning of the

following paragraph.

Attorney Joseph M. Alioto, who filed one
of the suits, charged that kickbacks are the
key to Ticketmaster's California monopoly.
"They're nothing more than a straight bribe,"
he said.
Ticketmaster and its affiliates took on
their California adversaries in typical
aggressive fashion, . . .

Based on this reported comment, T-NY brought suit

against Alioto in the United States District Court for the

District of Massachusetts. Invoking diversity jurisdiction, 28

U.S.C. 1332 (1988), it alleged that Alioto, with the requisite

intent, conveyed and/or caused to be conveyed certain defamatory

impressions of and concerning T-NY, namely, that T-NY engaged in

bribery and related criminal conduct.

In due season, Alioto moved to dismiss. T-NY objected.

The district judge heard oral argument and dismissed the action

for lack of in personam jurisdiction, concluding that appellant

failed to make the requisite showing at every stage of the

obligatory jurisdictional inquiry under the due process clause.

See United Electrical Workers v. 163 Pleasant St. Corp., 960 F.2d

1080, 1089 (1st Cir. 1992) (Pleasant St. I) (discussing nature of

requisite inquiry). Two perceptions figured prominently in the

4

district court's reasoning. First, the defendant did not

actively shape and focus the reporter's story, but, rather,

passively responded to a telephone call. Second, the allegedly

defamatory comment dealt with the California activities of a

California corporation, T-SC, and did not pertain to T-NY.

Plaintiff appeals. Because the court below dismissed

the case on legal grounds, without convening an evidentiary

hearing or resolving contested evidentiary questions, appellate

review is plenary. See United Electrical Workers v. 163 Pleasant

St. Corp., 987 F.2d 39, 43-44 (1st Cir. 1993) (Pleasant St. II);

Boit, 967 F.2d at 675. In conducting this tamisage, we are not

wedded to the district court's rationale, but remain free to

affirm the judgment below on any independently sufficient ground

made manifest by the record. See Martel v. Stafford, 992 F.2d

1244, 1245 (1st Cir. 1993).

II. ANALYSIS

To subject a non-resident defendant to its jurisdiction

in a diversity case, a court and for this purpose, a federal

court exercising diversity jurisdiction is the functional

equivalent of a state court sitting in the forum state, see

General Contracting & Trading Co. v. Interpole, Inc., 940 F.2d

20, 23 n.4 (1st Cir. 1991) must find contacts that, in the

aggregate, satisfy the requirements of both the forum state's

long-arm statute and the Fourteenth Amendment.3 See Pleasant

3To be sure, the extent of the necessary jurisdictional
showing varies depending upon whether a litigant asserts
jurisdiction over an adverse party under a theory of "general" or

5

St. I, 960 F.2d at 1086 ("In Massachusetts, a court may exercise

personal jurisdiction over a foreign defendant if such

jurisdiction is authorized by state statute or rule and its

exercise does not offend due process."); Bond Leather Co. v. Q.T.

Shoe Mfg. Co., 764 F.2d 928, 931 (1st Cir. 1985) (similar). The

district court determined that T-NY satisfied neither of these

two prerequisites. We explore these determinations.

A. The State Statute.

The applicable Massachusetts statute, familiarly known

as "section 3(c)," deals with torts committed by persons who have

no ongoing relationship with the forum state. The language of

this provision tracks the Uniform Interstate and International

Procedure Act, and differs significantly from other leading

formulations. See Murphy v. Erwin-Wasey, Inc., 460 F.2d 661,

663-64 (1st Cir. 1972); see also Margoles v. Johns, 483 F.2d

1212, 1216 (D.C. Cir. 1973). The statute states:

A court may exercise personal
jurisdiction over a person, who acts directly
or by an agent, as to a cause of action in
law or equity arising from the person's . . .
(c) causing tortious injury by an act
or omission in this Commonwealth . . . .

Mass. Gen. Laws ch. 223A, 3 (1986).

Although the lower court did not reach the question of

jurisdiction under state law, we have pondered whether the case

might more appropriately be dispatched on that basis. After all,

"specific" jurisdiction. See Donatelli v. National Hockey

League, 893 F.2d 459, 462-63 (1st Cir. 1990) (elucidating

standards and enumerating differences). Here, plaintiff's case
stands or falls on a theory of specific jurisdiction.

6

"[i]t has long been a basic tenet of the federal courts to eschew

the decision of cases on constitutional grounds unless and until

all other available avenues of resolution [have been] exhausted."

Aggarwal v. Ponce Sch. of Medicine, 745 F.2d 723, 726 (1st Cir.

1984). But here, as we explain below, the state-law issues are

extremely murky. Thus, on balance, we agree with the district

court that it makes sense to resolve the jurisdictional question

on constitutional grounds.

In the first place, although logic suggests that, on

these facts, the defendant cannot be said to have performed "an

act" in Massachusetts, that suggestion is not easily reconciled

with Murphy. There, we ruled that an allegedly tortious act

committed outside the borders of Massachusetts, purposefully

directed at the state and intended to cause injury there, could

constitute an in-forum act within the meaning of section 3(c).

See Murphy, 460 F.2d at 664. While Murphy can be distinguished

on the ground that it was decided in the context of fraudulent

misrepresentation, as opposed to defamation,4 its interpretation

of section 3(c) is worded in general terms and its reasoning

conceivably could be transferred to the defamation context.

Despite our profound reservations about extending the Murphy

4Appellant argues that we have already extended Murphy to

the defamation arena in Hugel v. McNell, 886 F.2d 1 (1st Cir.

1989), cert. denied, 494 U.S. 1079 (1990). We do not think Hugel

must necessarily be read so broadly. That case turned on a
construction of the New Hampshire long-arm statute, N.H. Rev.
Stat. Ann. 510:4 (1993), and the New Hampshire statute, unlike
its Massachusetts counterpart, does not embody the language of
the Uniform Act.

7

rationale,5 it spreads a shadow of uncertainty over the state-

law issues.

In the second place, because we are skeptical that

defendant made any remark "of and concerning" T-NY, we harbor

doubts whether defendant can be said to have inflicted any

"tortious injury" within the meaning of section 3(c).6 We are,

however, hesitant to move beyond an expression of skepticism. At

this stage of the proceedings, appellant has not had the benefit

of an evidentiary hearing or a comparable opportunity (say,

access to the full-dress summary judgment protocol after a

reasonable period of discovery) for presenting proof. Thus, it

may be too early to reach the state-law issues.

To be sure, our reservations about one or both of these

5Intuitively, it would seem hard to characterize the act of
publishing an allegedly defamatory remark outside the forum state
as an act within the forum state. In fact, no fewer than five
courts applying long-arm statutes patterned after the Uniform Act
have eschewed Murphy's reasoning in the defamation context and

declined to assert jurisdiction on this basis. See Reuber v.

United States, 750 F.2d 1039, 1049 (D.C. Cir. 1984); Dietrich v.

Wisconsin Patients Comp. Fund, 485 N.W.2d 614, 617-18 (Wis. Ct.

App. 1992); Wheeler v. Teufel, 443 N.W.2d 555, 558 (Minn. Ct.

App. 1989); Ramada Inns, Inc. v. Drinkhall, No. 83C-AU-ty,

unpaginated slip op. available on LEXIS (Del. Super. Ct. 1984);
Zinz v. Evans & Mitchell Indus., Inc., 324 A.2d 140, 144 (Md.

App. 1974); see also St. Clair v. Righter, 250 F. Supp. 148, 151

(W.D. Va. 1966) (using similar reasoning to interpret long-arm
statute containing "tortious act" language); see generally

Margoles, 483 F.2d at 1218-19 (criticizing Murphy's

interpretation of language drawn from the Uniform Act).

6In Massachusetts, a court has power to determine, as a
matter of law, that a particular remark is not susceptible of any
defamatory construction "of and concerning" the plaintiff, and,
therefore, not actionable. See Eyal v. Helen Broadcasting Corp.,

583 N.E.2d 228, 232 (Mass. 1991). At least one court has used
this type of power to dismiss a defamation case on jurisdictional
grounds. See Wyatt v. Kaplan, 686 F.2d 276, 282 (5th Cir. 1982).

8

points might well be resolved upon closer perscrutation. But

there is no need to sally forth. Because it is apodictic that a

jurisdiction-seeking plaintiff must satisfy the demands of not

only state law but also the federal Constitution, see Pleasant

St. I, 960 F.2d at 1086, and because T-NY's case cannot pass

constitutional muster, we choose to bypass the statutory phase of

the jurisdictional inquiry. Consistent with this approach, we

accept appellant's alleged facts as true for present purposes and

assume arguendo that the allegedly defamatory remark concerned T-

NY.

B. The Due Process Clause.

Divining personal jurisdiction is "more an art than a

science." Donatelli v. National Hockey League, 893 F.2d 459, 468

n.7 (1st Cir. 1990).7 In broad outline, a party wishing to

validate a court's jurisdiction must show that "minimum contacts"

exist between the defendant and the forum state. International

Shoe Co. v. State of Washington, 326 U.S. 310, 316 (1945). To

establish minimum contacts on a theory of specific jurisdiction,

a plaintiff must first demonstrate that its cause of action

"arises out of, or relates to" defendant's contacts with the

forum state, Helicopteros Nacionales de Colombia, S.A. v. Hall,

466 U.S. 408, 414 (1984). Then, the plaintiff must demonstrate

the deliberateness of the defendant's contacts, or, phrased

7In Donatelli, 893 F.2d at 462-65, we chronicled the

historical development of due process standards for personal
jurisdiction, and in Pleasant St. I, 960 F.2d at 1089, we

rehearsed the current state of the law.

9

another way, that the defendant "purposefully avail[ed] itself of

the privilege of conducting activities within the forum State."

Hanson v. Denckla, 357 U.S. 235, 253 (1958).

Even if a plaintiff succeeds in making these two

showings, it is not home free. The defendant may nonetheless

avoid having to defend in a strange place if it can establish

that allowing the suit to go forward would be inconsistent with

"fair play and substantial justice," International Shoe, 326 U.S.

at 320.

Following this analytic model, we first assess

relatedness and purposeful availment in terms of their

applicability to the case at hand. Finding them to be

inconclusive in this rather odd situation, we then mull the

extent to which considerations of fairness and substantial

justice must influence our ultimate decision.

1. Relatedness. The requirement that a suit arise out
1. Relatedness.

of, or be related to, the defendant's in-forum activities

comprises the least developed prong of the due process inquiry.

See Pleasant St. I, 960 F.2d at 1089 & n.9; see also Carnival

Cruise Lines v. Shute, 499 U.S. 585, 589 (1991) (declining to

reach issue despite having certified it for review). We know to

a certainty only that the requirement focuses on the nexus

between the defendant's contacts and the plaintiff's cause of

action.

The Court has kept its own counsel on the question of

whether, on the one hand, the two halves of the relatedness

10

requirement are merely two ways of expressing the same thought

or, on the other hand, they are meant to import different values

into the jurisdictional equation. See Helicopteros, 466 U.S. at

415 n.10 (reserving question). For our part, we think it

significant that the constitutional catchphrase is disjunctive in

nature, referring to suits "aris[ing] out of, or relat[ing] to,"

in-forum activities. Id. at 414 (emphasis supplied). We believe

that this added language portends added flexibility and signals a

relaxation of the applicable standard. A number of other courts

share this belief. See, e.g., City of Virginia Beach v. Roanoake

River Basin Ass'n, 776 F.2d 484, 487 (4th Cir. 1985); Southwire

Co. v. Trans-World Metals & Co., 735 F.2d 440, 442 (11th Cir.

1984); Thos. P. Gonzalez Corp. v. Consejo Nacional de Production,

614 F.2d 1247, 1254 (9th Cir. 1980); see also In re Oil Spill by

the Amoco Cadiz, 699 F.2d 909, 915 (7th Cir. 1983).

While we do not have occasion today to give fuller

content to the relatedness requirement,8 it is evident that the

requirement serves two functions. First, relatedness is the

8At least one scholar reads a line of First Circuit cases as
going beyond this point and proposing an innovative
constitutional test. See Mark M. Maloney, Specific Personal

Jurisdiction and the "Arise From or Relate to" Requirement . . .

What Does it Mean? 50 Wash. & Lee L. Rev. 1265, nn. 118-130 &

accompanying text (1993). In our view, these cases which
interpret the term "arising from" as that term is used in the
long-arm statutes of Massachusetts, see Fournier v. Best Western

Treasure Island Resort, 962 F.2d 126, 127 (1st Cir. 1992); Marino

v. Hyatt Corp., 793 F.2d 427, 430 (1st Cir. 1986), and Puerto

Rico, see Pizarro v. Hoteles Concorde Int'l, Inc., 907 F.2d 1256,

1259-60 (1st Cir. 1990) deal with state-law issues and have no
real implications for the relatedness requirement specifically or
for constitutional analysis generally.

11

divining rod that separates specific jurisdiction cases from

general jurisdiction cases. Second, it ensures that the element

of causation remains in the forefront of the due process

investigation. Even if the facts are such that a court may not

dismiss a given case for lack of relatedness per se, the

relatedness requirement, in serving its second function,

authorizes the court to take into account the strength (or

weakness) of the plaintiff's relatedness showing in passing upon

the fundamental fairness of allowing the suit to proceed.

In this vein, it is important to recognize that, when

the defendant in a defamation action is a journalist's source,

the link between the defendant's conduct and the cause of action

is attenuated by the intervening activities of third parties,

e.g., the reporter, the editor, the media outlet, and that those

intermediaries shape, amplify, and occasionally distort the

original utterance. This case illustrates the point. The

original comment, technically a tort in its own right (if

defamatory), inflicted no significant injury, except insofar as

it led to republication in the ensuing newspaper article and

the form and tone of the republication was not by any stretch of

the most active imagination within the defendant's effective

control.

2. Purposeful Availment. The question here must be
2. Purposeful Availment.

phrased in terms of whether an individual who merely answers a

telephone call, but, having done so, knowingly directs his

comments into the forum state, may be said to have purposefully

12

availed himself of the privilege of conducting activities in the

state.9

To answer the question, we begin by considering McBreen

v. Beech Aircraft Corp., 543 F.2d 26 (7th Cir. 1976), a case that

the district court thought highly pertinent and that Alioto touts

as dispositive. There, the Seventh Circuit refused to sanction

the exercise of jurisdiction because the defendant, a

journalistic source, did not initiate the defamatory exchange,

and, being unaware of either the reporter's whereabouts or the

magazine's reach, could not reasonably have foreseen that his

comment would cause injury in the forum state. See id. at 28.

The two conditions identified as salient in McBreen

correspond to the two cornerstones of purposeful availment. One

cornerstone is foreseeability. See, e.g., Escude Cruz v. Ortho

Pharmaceutical Corp., 619 F.2d 902, 905 (1st Cir. 1980); see also

World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980)

(stating that, for a court to assert jurisdiction, a defendant's

"conduct and connection with the forum State [must be] such that

he should reasonably anticipate being haled into court there").

The second cornerstone, less frequently recognized as such, is

9Appellant's efforts to reframe this question by hinting
that Alioto instigated the call are unavailing. The burden of
proving jurisdictional facts rests on the shoulders of the party
who seeks to invoke the court's jurisdiction. See McNutt v.

General Motors Acceptance Corp., 298 U.S. 178, 189 (1936);

Martel, 992 F.2d at 1247 n.5; Pleasant St. I, 960 F.2d at 1090.

On this principle, and in the absence of even a representation or
firm allegation to the contrary, we must presume, as did the
court below, that Alioto played no part in initiating the
telephone call.

13

voluntariness. See Vencedor Mfg. Co. v. Gougler Indus., Inc.,

557 F.2d 886, 891 (1st Cir. 1977); see also Burger King Corp. v.

Rudziewicz, 471 U.S. 462, 475 (1985) (cautioning that

jurisdiction may not rest on the "unilateral activity of another

party or a third person"). In McBreen, these two cornerstones

were poorly laid: a failed showing of foreseeability and a

questionable showing of voluntariness combined to form an

insufficiently sturdy foundation to support in personam

jurisdiction. The instant case, which amalgamates an arguably

successful showing of foreseeability with a dubious showing of

voluntariness, is a closer call. We turn, then, to a broader

survey of analogous case law.

Courts are consentient that when, as in McBreen, the

source of an allegedly defamatory remark did not initiate the

pivotal contact, and the in-forum injury is not reasonably

foreseeable, jurisdiction may not be asserted over the source

based on the comment.10 See, e.g., Madara v. Hall, 916 F.2d

1510, 1517-19 (11th Cir. 1990); Mann v. Tom James Co., 802 F.

Supp. 1293, 1296-97 (E.D. Pa. 1992). However, when the source

10Appellant characterizes Hugel v. McNell, 886 F.2d 1 (1st

Cir. 1989), cert. denied, 494 U.S. 1079 (1990), and Advanced

Dictating Supply, Inc. v. Dale, 524 P.2d 1404 (Ore. 1974), as

cases in which courts asserted jurisdiction even though
defamatory exchanges were initiated by persons other than the
defendants. We reject the characterization. Our opinion in
Hugel, read in context, makes it clear that the defendants played

an active role, meeting repeatedly with journalists and supplying
them with audiotapes and other information. See Hugel, 886 F.2d

at 2-3. The Advanced Dictating court likewise found sufficient

evidence to conclude that the defendants incited the reporter's
telephone call. See Advanced Dictating, 524 P.2d at 1406-07.

14

takes the initiative and causes foreseeable injury, jurisdiction

may lie. See, e.g., Brown v. Flowers Indus., Inc., 688 F.2d 328,

333-34 (5th Cir. 1982); Rusack v. Harsha, 470 F. Supp. 285, 291

(M.D. Pa. 1978); Fallang v. Hickey, 532 N.E.2d 117, 118-19 (Ohio

1988); see also supra note 10 and cases discussed therein.

This case falls between the stools, for, although the

source did not initiate the contact, the resultant in-forum

injury was foreseeable. In this posture, the authorities are

divided. Two courts have declined jurisdiction under such

circumstances. See National Ass'n of Real Estate Appraisers v.

Schaeffer, Bates & Co., 1989 U.S. Dist. LEXIS 3098 at *2, *10

(C.D. Cal. Mar. 23, 1989) (refusing to assert jurisdiction over a

Rhode Island source for comments made in the course of responding

to a telephone call from a reporter for a California newspaper);

McDonald v. St. Joseph's Hosp., 574 F. Supp. 123, 124, 126-27

(N.D. Ga. 1983) (similar; individual defendant answered several

telephone calls from a hospital interested in employing

plaintiff, and made allegedly defamatory remarks with full

knowledge of their potential consequences). At least one other

court has asserted jurisdiction in such a situation. See Dion v.

Kiev, 566 F. Supp. 1387, 1388-90 (E.D. Pa. 1983) (exercising

jurisdiction over a New York defendant who answered a telephone

call from a reporter for a Philadelphia newspaper). Other straws

in the decisional wind blow in differing directions.11

11In examining the case law, we have considered and
rejected appellant's suggested analogy to a line of fraudulent
misrepresentation cases. See, e.g., Ealing Corp. v. Harrods

15

Compare, e.g., Berrett v. Life Ins. Co. of the Southwest, 623 F.

Supp. 946, 950 n.3 (D. Utah 1985) (declining to assert

jurisdiction, discussing McBreen, and treating the fact that the

defendant did not initiate the contact as dispositive) with,

e.g., Cole v. Doe, 258 N.W.2d 165, 168 (Mich. 1977) (upholding

jurisdiction, without any discussion of initiation, where a

source, able to foresee republication in the forum state, made an

allegedly defamatory remark in a telephone interview with a

nationally syndicated columnist).

Having found the case law in a muddle, we consider

appellant's invitation that we adopt the classic analogy for an

out-of-state libel: the gunman firing across a state line. See

Buckley v. New York Post Corp., 373 F.2d 175, 179 (2d Cir. 1967).

In a situation like this one, the analogy is imperfect. The

person who responds to a journalist's question in the course of

an interview initiated by the latter is less like a traditional

sniper and more like a person who has been transported to the

border and eased into position behind a rifle aimed at a pre-

selected target. While such a person retains the choice of

pulling the trigger, or not, he cannot fairly be equated with an

individual who has achieved the same position through a series of

Ltd., 790 F.2d 978, 982 (1st Cir. 1986); Murphy, 460 F.2d at 663-

64; Johnson v. Witkowski, 573 N.E.2d 513, 523 (Mass. App. 1991);

Burtner v. Burnham, 430 N.E.2d 1233, 1236 (Mass. App. 1982).

These cases are unhelpful because a business relationship almost
invariably entails some degree of initiative and forethought on
the part of the persons involved, and, therefore, initiation and
foreseeability are necessarily present.

16

personalized affirmative choices reaffirmed at every significant

juncture.12

The conclusion that we draw from this line of reasoning

is that appellant has made only the most marginal of showings

that Alioto purposefully availed himself of an opportunity to act

in Massachusetts. And the weakness of this showing assumes

decretory significance when we step back and evaluate the

fairness of asserting jurisdiction in the totality of the

circumstances.

3. The Gestalt Factors. In constitutional terms, the
3. The Gestalt Factors.

jurisdictional inquiry is not a mechanical exercise. The Court

has long insisted that concepts of reasonableness must inform a

properly performed minimum contacts analysis. See, e.g.,

Woodson, 444 U.S. at 292; International Shoe, 326 U.S. at 320.

"This means that, even where purposefully generated contacts

exist, courts must consider a panoply of other factors which bear

upon the fairness of subjecting a nonresident to the authority of

a foreign tribunal." Pleasant St. I, 960 F.2d at 1088; accord

Donatelli, 893 F.2d at 464-65. The Supreme Court has identified

five such factors, namely, (1) the defendant's burden of

appearing, (2) the forum state's interest in adjudicating the

dispute, (3) the plaintiff's interest in obtaining convenient and

effective relief, (4) the judicial system's interest in obtaining

12Withal, we recognize that a person speaking on the
telephone is free to refrain from making defamatory statements in
the same way that a person standing beside a telephone is free to
refrain from calling a reporter. In terms of moral philosophy,
both persons, by acting, commit acts of will.

17

the most effective resolution of the controversy, and (5) the

common interests of all sovereigns in promoting substantive

social policies. See Burger King, 471 U.S. at 477. We have

labelled this group of considerations the "gestalt factors." See

Pleasant St. I, 960 F.2d at 1088; Donatelli, 893 F.2d at 465.

The gestalt factors are not ends in themselves, but

they are, collectively, a means of assisting courts in achieving

substantial justice. In very close cases, they may tip the

constitutional balance. See Burger King, 471 U.S. at 477-78

(explaining that "minimum requirements inherent in the concept of

'fair play and substantial justice' may defeat the reasonableness

of jurisdiction even if the defendant has purposefully engaged in

forum activities") (citation omitted). For example, in Asahi

Metal Indus. Co. v. Superior Court, 480 U.S. 102 (1987), eight

Justices agreed that asserting jurisdiction would be

unreasonable, although the question of minimum contacts was so

close that it divided the Court. See id. at 114-15. In the

estimation of at least four Justices, considerations of

reasonableness sufficed to defeat jurisdiction notwithstanding

that the defendant purposefully engaged in activities within the

forum. See id. at 116-17 (separate opinion of Brennan, J.,

joined by White, Marshall, & Blackmun, JJ.). Justice Stevens,

although not joining Justice Brennan's concurrence, expressed

satisfaction with the theory underlying this conclusion. See id.

at 121-22 (separate opinion of Stevens, J.).

This aspect of the jurisdictional inquiry remains

18

something of an unknown quantity. The gestalt factors have been

applied by the Court only once (in Asahi); beyond mere mention,

they have been discussed on rare occasions by the courts of

appeals, see, e.g., Gould v. Krakatau Steel, 957 F.2d 573, 576

(8th Cir.), cert. denied, 113 S. Ct. 304 (1992); Theunissen v.

Matthews, 935 F.2d 1454, 1460-61 (6th Cir. 1991), and they have

been used regularly to defeat jurisdiction only in the Ninth

Circuit, see Mona A. Lee, Burger King's Bifurcated Test for

Personal Jurisdiction, 66 Temp. L. Rev. 945 (1993) (surveying

circuits). That circuit has concluded that dismissal may be

appropriate on grounds of reasonableness even if considerations

of relatedness or purposefulness, taken in isolation, could

support the exercise of jurisdiction. See Fields v. Sedgwick

Associated Risks, Ltd., 796 F.2d 299, 302 (9th Cir. 1986)

(finding the assertion of jurisdiction unreasonable though the

showing of purposefulness was "certainly of a nature that would

support jurisdiction"); see also FDIC v. British-American Ins.

Co., 828 F.2d 1439, 1442 (9th Cir. 1987) (collecting cases in

which courts denied jurisdiction for lack of reasonableness

without resolving questions anent relatedness and

purposefulness); Decker Coal Co. v. Commonwealth Edison Co., 805

F.2d 834, 840 (9th Cir. 1986) (limning Ninth Circuit's multi-

factor reasonableness test).

We agree in principle with the Ninth Circuit. We hold,

therefore, that the Due Process Clause bars a court from

asserting jurisdiction over the person of a defendant if doing so

19

would be fundamentally unfair. In this context, gauging fairness

requires an assessment of reasonableness for, in certain

circumstances, unreasonableness can trump a minimally sufficient

showing of relatedness and purposefulness. We think, moreover,

that the reasonableness prong of the due process inquiry evokes a

sliding scale: the weaker the plaintiff's showing on the first

two prongs (relatedness and purposeful availment), the less a

defendant need show in terms of unreasonableness to defeat

jurisdiction. The reverse is equally true: an especially strong

showing of reasonableness may serve to fortify a borderline

showing of relatedness and purposefulness. See Donatelli, 893

F.2d at 465. It is against this backdrop, then, that we proceed

to sift the gestalt factors.13

a. The Burden of Appearance. The burden associated
a. The Burden of Appearance.

with forcing a California resident to appear in a Massachusetts

court is onerous in terms of distance, and there are no

mitigating factors to cushion that burdensomeness here. This

burden, and its inevitable concomitant, great inconvenience, are

entitled to substantial weight in calibrating the jurisdictional

scales. Indeed, the Court has stated that this element, alone

13The approach that we endorse today differs slightly from
that of the Ninth Circuit, which has crafted its own version of a
sliding scale approach. The Ninth Circuit's methodology, as we
understand it, incorporates the element of purposefulness into
the third prong of the inquiry, and weighs it against the
remaining considerations of reasonableness. See Core-Vent Corp.

v. Nobel Indus. AB, 11 F.3d 1482, 1488 (9th Cir. 1993); see also

Insurance Co. of North Am. v. Marina Salina Cruz, 649 F.2d 1266,

1271 (9th Cir. 1981) ("The smaller the element of purposeful
interjection, the less is jurisdiction to be anticipated and the
less reasonable is its exercise.").

20

among the gestalt factors, is "always a primary concern."

Woodson, 444 U.S. at 292.

These are not empty words, for most of the cases that

have been dismissed on grounds of unreasonableness are cases in

which the defendant's center of gravity, be it place of residence

or place of business, was located at an appreciable distance from

the forum. See, e.g., Asahi, 480 U.S. at 114 (Japanese defendant

sued in California); Core-Vent Corp. v. Novel Indus. AB, 11 F.3d

1482, 1488-90 (9th Cir. 1993) (Swedish defendant sued in

California; defamation action); Amoco Egypt Oil Co. v. Leonis

Navigation Co., 1 F.3d 848, 852 (9th Cir. 1993) (Filipino

defendant sued in Washington); Casualty Assur. Risk Ins.

Brokerage Co. v. Dillon, 976 F.2d 596, 600 (9th Cir. 1992)

(District of Columbia defendant sued in Guam; defamation action);

Fields, 796 F.2d at 302 (British defendant sued in California).

The effect of distance on jurisdictional outcomes is graphically

illustrated by the two cases in which a defendant's contacts with

the forum were most strikingly reminiscent of those that have

been assembled here. Compare National Ass'n of Real Estate

Appraisers, 1989 U.S. Dist. LEXIS at *11 (declining to assert

jurisdiction over Rhode Island defendant who would have had to

defend defamation suit in California) with Dion, 566 F. Supp. at

1387 (asserting jurisdiction over New York defendant forced to

defend defamation suit in Pennsylvania).

Furthermore, as the court below observed, the

circumstances surrounding this case suggest that the

21

inconvenience to the defendant may not be coincidental. It is

the rare libel case in which both the newspaper and the reporter,

though amenable to process, are relegated to the sidelines at the

behest of an avowedly defamed plaintiff. It is rarer still to

discover that such a plaintiff has intentionally selected a forum

in which punitive damages are unavailable, bypassing other fora

in which such damages might be awarded.

Such considerations are important. One reason that the

factor of inconvenience to the defendant weighs heavily in the

jurisdictional balance is that it provides a mechanism through

which courts may guard against harassment. It is firmly settled

that a "plaintiff may not, by choice of an inconvenient forum,

`vex,' `harass,' or `oppress' the defendant by inflicting upon

him expense or trouble not necessary to his own right to pursue

his remedy." Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508 (1947)

(citations omitted). And although vexatious suits are more

frequently dismissed under the doctrine of forum non conveniens,

we believe that the reasonableness analysis required by the third

prong of the due process inquiry must be in service to the same

ends.

b. Interest of the Forum. The forum state has a
b. Interest of the Forum.

demonstrable interest in exercising jurisdiction over one who

causes tortious injury within its borders. See Keeton v. Hustler

Magazine, Inc., 465 U.S. 770, 776 (1984). Though we deem it

inappropriate to correlate the strength or weakness of

appellant's case on the merits with the strength or weakness of

22

the forum state's interest in this regard, we think it is both

appropriate and useful to note two special considerations.

First, the Commonwealth's interest in the litigation sub judice

is arguably lessened by the doubts surrounding whether

defendant's act can be said to have been committed in the forum,

see supra p. 7. Second, if appellant in fact filed suit

primarily to retaliate against Alioto's role in the California

litigation rather than to right an independent wrong and as

previously mentioned there are some clues in the record that

could lead to such a deduction the Commonwealth's interest

would be much diminished. Cf., e.g., Asahi, 480 U.S. at 114-15

(minimizing forum state's interest in protecting its citizens

from tortious injury because a dispute was "primarily about

indemnification rather than safety standards"). Mindful of these

special considerations, we conclude that the forum has a milder

than usual interest in the further prosecution of T-NY's suit.

c. The Plaintiff's Convenience. Given the sparseness
c. The Plaintiff's Convenience.

of the record, it is difficult to say whether trying the case in

Massachusetts would be more convenient for plaintiff than trying

it in California. Certain key witnesses on the issue of injury

may be in Massachusetts, including the reporter. But other key

witnesses may well be residents of California. While we must

accord plaintiff's choice of forum a degree of deference in

respect to the issue of its own convenience, see Piper Aircraft

Co. v. Reyno, 454 U.S. 235, 241 (1981), the plaintiff's actual

convenience seems to be at best a makeweight in this situation.

23

d. The Administration of Justice. Apart from the
d. The Administration of Justice.

possibility that plaintiff's action might be thought vexatious,

see supra Part II(B)(3)(a), the interest of the judicial system

in the effective administration of justice does not appear to cut

in either direction.

e. Pertinent Policy Arguments. One substantive social
e. Pertinent Policy Arguments.

policy that seems to counsel against exercising jurisdiction is

the widely shared interest in preserving citizens' willingness

to talk openly with the press. Forcing an individual to fly

cross-country on the strength of one answered telephone call from

a journalist likely would tend to dry up sources of information

and thereby impede the press in the due performance of its proper

function. Nonetheless, the Court has shied away from allowing

First Amendments concerns to enter into the jurisdictional

analysis. See Keeton, 465 U.S. at 780 n.12; Calder v. Jones, 465

U.S. 783, 790 (1984). Although it might be argued convincingly

that the jurisdictional calculus ought to produce somewhat

different results in defamation actions filed against reporters'

sources than in actions filed against the journalists responsible

for republication of a source's remark, as in Calder, or against

the media corporation itself, as in Keeton, these precedents give

us pause. Consequently, we place no weight on First Amendment

values for purposes of this appeal.

4. Tallying the Results. We begin the final phase of
4. Tallying the Results.

our analysis by retracing our steps. At the first stage of the

due process inquiry, appellant succeeded in showing that its

24

putative cause of action arose from, or related to, defendant's

contacts with the forum. See supra Part II(B)(1). At the second

stage of the inquiry, appellant succeeded in showing defendant's

purposeful availment. See supra Part II(B)(2). On neither

prong, however, did appellant demonstrate more than a bare

minimum; we found its claim of relatedness enfeebled by the

attenuated causal link between the allegedly defamatory utterance

and the harm allegedly suffered, and its claim of purposefulness

enfeebled by the fact that the defendant did not initiate either

the telephone call or the resultant interview.

The frailty of appellant's showings on the first two

furcula of the due process inquiry required us to consider the

gestalt factors and assess the reasonableness of an assertion of

jurisdiction by a Massachusetts court. Doing so, see supra Part

II(C), we found that, while many of those factors possess little

significance for purposes of this case, there is one factor the

defendant's convenience that stands out from the crowd. It is

this factor that consistently has been declared deserving of the

greatest weight in kindred cases. And it is this factor that may

serve as an amulet to ward off vexatiousness and harassment. We

now conclude, considering the totality of the circumstances, that

defendant's burden of appearance is so onerous that it renders

the exercise of in personam jurisdiction unreasonable. This

conclusion carries the day. A distant court cannot

constitutionally exercise in personam jurisdiction over a non-

resident defendant at the behest of a plaintiff who can muster

25

only the most tenuous showings of relatedness and purposefulness

if, as in this case, forcing the defendant to defend in the forum

would be plainly unreasonable.

This is as it should be, for, at bottom, the dictates

of due process demand that a court's assertion of in personam

jurisdiction comport with considerations of fair play and

substantial justice. See, e.g., International Shoe, 326 U.S. at

320. To ensure achievement of this goal, the machinery of

jurisdictional analysis is designed to refine judges' intuitions

about the relevant equities, not to eliminate those equities from

the decisional process. Relatedness and purposeful availment are

cogs in this analytic machinery. The gestalt factors comprise

the machinery's fail-safe device; they are not a necessary part

of the machinery's day-to-day operation, but if, in the course of

a particularized analysis, the gears mesh imperfectly because a

given set of facts does not fit into any of the standard molds,

the gestalt factors take hold.

This case exemplifies the proper operation of the fail-

safe device. It hardly seems fair, on the strength of a single

remark uttered in the course of a single unsolicited telephone

call from a Massachusetts-based journalist, to compel a

California resident to defend a tort suit in a court 3000 miles

away. The unfairness is heightened because the link between the

remark and the injury has been attenuated by republication in the

popular press. Our commitment to fair play and substantial

justice precludes us from subjecting a person to the rigors of

26

long-distance litigation on the basis of so gossamer a showing of

causation and voluntariness.

We need go no further. When all is said and done,

courts must assert jurisdiction, or abjure its assertion, with an

eye toward fundamental fairness. Thus, here, the district

court's dismissal of the instant action for want of in personam

jurisdiction must be

Affirmed.

27